## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,
Plaintiff,

v.                                Docket No. 22-CR-1002  DHU

JEREMY HUNT,
Defendant

### JEREMY HUNT'S SENTENCING MEMORANDUM

Jeremy Hunt respectfully requests pursuant to ***United States v. Booker, 543 U.S. 220*** ***(2005)*** and ***18 U.S.C. § 3553(a)***, that the Court grant a variance from the applicable guideline range, and fashion a sentence sufficient but not greater than necessary to achieve the purposes of sentencing.  In ***Koon v. United States,*** , the Supreme Court stated that the sentencing judge must "consider every convicted person as an individual and every case a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." ***528*** ***U.S. 81, 113 (1996)***.  Later, in ***Gall v. United States***, the Supreme Court made it clear that a sentencing judge "may not presume that the Guidelines range is reasonable." ***128 S.Ct. 586***, ***596*** ***(2007)***.  These entrenched principles are especially applicable to Hunt's case where the guideline range exceeds the statutory maximum based on a criminal history that began only after military service, traumatic injuries, PTSD, and a resulting severe substance abuse problem.

### Guidelines

The PSR [Doc 55] calculates the base offense level as 26 [PSR ¶20], a total offense level as 27 [PSR ¶29], criminal history level V[1] [PSR ¶47], resulting in a guideline range of 120 to 150 months, which becomes 120 months based on the statutory maximum of 10 years [PSR ¶98].

---

[1] The criminal history category is based on a score of 11. [See PSR ¶46 & Doc 59, Second Addendum to the Presentence Report]

A number of objections were resolved informally, however, four remain.  Objection No. 2 [2nd PSR, Doc 55, ¶36], is resolved in that 2 points were removed from the criminal history calculation. [Doc 54, Probation Response #2].  The defendant still does not agree that the traffic offense listed in ¶36 should count, however, after consulting with the government, the parties agree that for purposes of this case it's a moot point because it does not affect the criminal history calculation.

Objection No. 3 [2nd PSR, Doc 55, ¶40] does not affect the criminal history calculation because the number of countable 1 point offenses is limited to 4 points.  The only question is whether adding a charge to a booking sheet constitutes an "arrest."  A warrant was never issued for the offense of possession in either the magistrate court case (M-47-FR-2019-00527) or the district court case (D-1116-CR-2019-777).  The charge was added to the booking sheet after methamphetamine was found on Hunt's person during booking and Hunt was subsequently arraigned on the charge.

Objection No. 8 [2nd PSR, Doc 55, ¶96] regards whether Hunt can afford a fine.  Probation's addendum reads that it "appears that the defendant has the ability to pay a *minor* (emphasis added) fine."  After consulting with the government about the remaining objections, it appears the government will not be asking for a fine.

Objection No. 12 [2nd PSR, Doc 55, ¶79] is more in the nature of a clarification/correction and is addressed in Dr. Johnson's evaluation [Eval, p.12].  Hunt states he was never shot.

### Nature of the Offense & History and Characteristics of the Defendant

Hunt is at the highest base offense level for a 922(g) conviction, and the second highest criminal history category. Both of these over-represent the seriousness of Hunt's criminal history when the underlying facts of his prior convictions and the nature of the offenses are taken into

consideration, and Hunt requests a variance from the base offense level and a variance/departure from the criminal history category.

The guidelines recognize "that the criminal history score is unlikely to take into account all the variations in the seriousness of criminal history that may occur." ***USSG 4A1.3, Background***. As early as 1991, the 4th Circuit recognized the flexibility of the criminal history guidelines:

> "Criminal history" is, relatively, one of the most flexible concepts in the guidelines. While it is possible to classify the severity of current federal offenses with a reasonable degree of precision, mathematically accurate evaluation of the countless possible permutations of criminal history, involving offenses high and petty committed in numerous jurisdictions, would be at best unwieldy.

***United States v. Adkins, 937 F.2d 947, 952 (4th Cir. 1991)***.

***USSG §4A1.3(b)(1)*** states that a departure may be warranted "[i]f reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history…"  A variance however can be imposed without compliance with the rigorous requirements for departures, ***U.S. v. Gantt, 679 F.3d 1240, 1247 (10th Cir. 2012)***, and "is based entirely on the sentencing court's discretionary authority as long as the court justifies its sentence based on the §3553(a) factors." ***United States v. Barnes, 890 F.3d 910, 920 (10th Cir. 2018)***. The 10th Circuit will "uphold even substantial variances when the district court properly weighs the §3553(a) factors and offers valid reasons for the chosen sentence." ***Id. at 916***.

Hunt's base offense level is based on two trafficking controlled substances convictions. On May 17, 2021, Hunt plead guilty[2] in San Juan County District Court to six offenses in a global resolution of six pending cases (PSR, ¶s38-43], a plea that included two trafficking cases [PSR, ¶s38 & 43]. The first trafficking case  was based on three baggies with total weights (packaging and drugs) of 1.15g (meth), 1.38g (meth) and 1.7g (heroin), and $1,224 of cash in Hunt's

---

[2] Hunt is pending sentencing on the State's motion to revoke probation filed February 21, 2022. Sentencing has been postponed until after sentencing in this case, and is currently scheduled for March 13, 2024.

possession. [PSR, ¶38; Doc 54, Addendum].  Similarly, the second trafficking case was based on 1.14g of heroin [PSR, ¶43].  Given Hunt's monthly disability payments and his severe drug addiction, these amounts of drugs and cash are not only consistent with possession for personal use, but are easily distinguishable from the vast majority of trafficking cases that would lead to a base offense level of 26.  These convictions place Hunt in the same base offense level as a person engaged in a large scale conspiracy where far larger quantities of drugs are involved.

In this offense, the firearm had a 17 round magazine, therefore, his base offense level would be either 20, 22 or 26, depending on the number of prior convictions.  Given the factual bases for the prior convictions, a variance of 4 offense levels – an equivalent of a base offense level of 22 – is a more appropriate starting point for the guideline calculation.

Hunt's criminal history has only one conviction for a violent offense, aggravated assault. The aggravated assault is based on Hunt pointing a gun at a person who approached Hunt in Hunt's car, opened the door to Hunt's car and confronted Hunt.  The gun was not fired and Hunt immediately drove away. [PSR, ¶39].

Hunt's criminal history points are unusual; he received two points for relatively minor offenses and one point for more serious offenses.  Hunt received two points for minor traffic offenses - namely, no insurance, vehicle registration suspended and a concealed license plate. [PSR, ¶36].  This nine year old conviction alone increases Hunt' criminal history from category IV to category V.  If the Court grants no other variance based on criminal history or Hunt's base offense level, a variance/departure to criminal history category IV is warranted on this basis alone.

Other factors warrant an additional variance/departure to a criminal history category III. The remaining two point offenses are also non-violent offenses. Hunt pled to a Colorado attempted forgery where no restitution was requested and the sentence was "time served." [Doc

55, PSR, ¶42].  In Massachusetts, Hunt plead to what the docket sheet labeled "Firearm

Unattended" in violation of Chapter 269, §10(h)(2)[3], and also received a "time served" sentence.

Hunt has seven one-point offenses, but only four are counted.  Of these, two points are for

DWIs in Massachusetts and Colorado [PSR, ¶s32 & 37] and two points are for simple possession

cases in New Mexico [PSR, ¶s 40 & 41].  One possession conviction is based on some detectable

amount of methamphetamine "rolled up in a 50 dollar bill." ***See Statement of Probable Cause,***

***State v. Jeremy Hunt, M-47-FR-2019-00527***.  Likewise, the second possession conviction is

based on .17g of amphetamine found in a rolled up dollar bill.  The other three point offenses are

the two trafficking cases and aggravated assault discussed above.  All seven points are the result of

a severe drug/alcohol problem, all of which began after Hunt's military service.  These four points

alone (after deducting the two points for traffic offenses) increase Hunt's criminal history from

category III to category IV.

Hunt's requested variance/departure based on criminal history to a total offense level 23,

criminal history category III, results in a guideline range of 57-71 months.  Although Hunt's

criminal history is lengthy, the underlying facts of the convictions reflect a serious substance

abuse problem rather than a criminal livelihood.  As such, for the reasons discussed above, a

starting guideline range of 57-71 months is far more appropriate than a starting guideline range of

10 years.  See ***United States v. Harrison, 9 F.3d 118 (10th Cir. 1993)***, ***unpublished opinion***

(departure from criminal history VI to I that included five DWIs not clearly erroneous;  remanded

twice for a statement of reasons for the degree of departure); ***United States v. Owensby, 188 F.3d***

***1244 (10th Cir. 1999)*** (district court departed one criminal history level, and would have departed

---

[3] (h)(2) Any person who leaves a firearm, rifle, shotgun or ammunition unattended with the intent
to transfer possession of such firearm, rifle, shotgun or ammunition to any person not licensed
under section 129C of chapter 140 or section 131 of chapter 140 for the purpose of committing a
crime or concealing a crime shall be punished by imprisonment in a house of correction for not
more than 2 ½ years or in state prison for not more than 5 years.

two levels if he felt he could, where the defendant's two DWIs resulted in 4 criminal history points).

**Nature of the Offense & History and Characteristics of the defendant**

Hunt's criminal history must be viewed in context; it began only after his discharge from the Army.  Hunt served in the US Army from February 2007 until April 2011 and was honorably discharged.  [PSR, ¶93]  The Presentence Report notes that Hunt served two one-year deployments in Iraq and "experienced significant traumatic events." [PSR, ¶114]  Hunt has been diagnosed with PTSD from combat trauma and now receives full disability. [PSR, ¶s81 ,82 & 94] He suffered a head injury in 2007 [PSR, ¶79], a far more severe traumatic head injury in 2014 as well as other significant injuries [PSR, ¶79].  Ex. A, Jeremy Hunt Evaluation, Dr. Christine Johnson, filed under seal, includes a detailed chronology of Hunt's childhood, military service, traumatic injuries, substance abuse issues, mental health problems and prior treatment through the VA..  Dr. Johnson's evaluation describes in detail what is essentially an unfolding tragedy culminating in Hunt's current situation – facing a ten year sentence in federal court and up to twenty-five some years in a New Mexico state court proceeding.  The evaluation supports an additional variance for a number of factors in addition to Hunt's criminal history.

**Psychological Testing**

The Centers for Disease Control and Prevention (CDC) defines ACEs as potentially traumatic events that occur from the ages of 0-17, and include, but are not limited to, abuse, neglect, exposure to violence in the home or community, or being reared in a household with family members who experience severe mental health difficulties or substance use problems. See https://www.cdc.gov/violenceprevention/aces/fastfact.html.  ACES are shown to have lasting negative impacts on an individual's mental and physical health and and increase risk for substance abuse. *Id*.  The CDC estimates that 64% of U.S. adults have experienced at least one type of ACE

before age 18, and 17.3% had experienced four or more types of ACEs. *Id.*  The BOP uses the Adverse Childhood Experiences Scale as part of its Needs Assessment to evaluate the Trauma Need component, finding that "adverse childhood experiences were found to be associated with significant increases in a number of negative social, behavioral health, and physical health outcomes." ***See First Step Act Needs Assessment, Reentry Services Division, June 2021, p. 2, 17 (https://www.bop.gov/inmates/fsa/programs.jsp)***.  See also, ***Ex. A, Jeremy Hunt Evaluation, Dr. Christine Johnson (Eval.), p. 21-22***.  Dr. Johnson's testing found that Hunt reported adversity in 9 of 10 domains, a high score consistent with his development of significant emotional and behavioral problems. [Eval at 22]  She also found that Hunt suffered from neurodevelopmental difficulties consistent with ADHD and other disorders. [Eval at 23]   Finally, she confirmed the VA's long standing PTSD diagnosis. [Eval at 19-21, 24]

      Similar to departures/variances for lack of youthful guidance[4] and/or tragic or troubled childhood, courts have varied based on adverse childhood experiences. See ***United States v. Franklin, 2022 WL 16921811, at *2 (M.D.Ala., 2022***) (varied downward by an additional 12 months to account for both Franklin's documented "adverse childhood experiences" (that is, ACEs);  12-month reduction is a modest mitigation to account for these significant and relevant contextual circumstances); ***United States v. Carter, F.Supp.3d , 1211 (M.D.Ala., 2020)*** (there are 10 basic categories of ACEs: emotional abuse; physical abuse; sexual abuse; witnessing domestic violence; substance abuse in the home; mental illness in the home; parental separation or divorce; having an incarcerated family member; emotional neglect; and physical neglect. A person's risk of

---

[4] In 2021, courts listed lack of youthful guidance/tragic or troubled childhood as a basis for a downward variance in 1,852 (2.2%) cases. ***2021 Sourcebook, Table 44, p. 105***. In 2022, this factor was used in 2,278 (2.2%) of cases. ***2022 Sourcebook, Table 44, p. 105***. (https://www.ussc.gov/search/site?search=sourcebook&sort_by=search_api_relevance&sort_order=DESC)

serious, long-term adverse effects becomes very high once the individual has experienced four of these 10 categories).  The combination of adverse childhood experiences, neurodevelopmental difficulties and PTSD resulting from his combat experience warrant a variance from the guidelines.

### Traumatic Brain Injury

Hunt's history of traumatic brain injuries is discussed in detail in Dr. Johnson's evaluation. Her conclusion is a provisional diagnosis of an Unspecified Neurocognitive Disorder, which is consistent with documented deterioration in judgment, impulse control and emotion and behaviorial self-control since the 2014 TBI, as well as the VA's 2016 assessment's reference to "frontal lobe issues." [Eval at 24]  This presents an additional mitigating factor related to the history and characteristics of the defendant.  Dr. Johnson's recommendation includes additional testing.

### Military Service

Dr. Johnson's evaluation discusses Hunt's military service in detail and resulting 100% disability for PTSD.  He began his service as a mechanic, was a Chinook helicopter gunner on his first tour, a crew chief and helicopter gunner on his second tour, and part of a Downed Aircraft Recovery Team. [Eval at 5]  The "significant traumatic events" noted in the PSR (¶114) included picking up severely burned dead and wounded, flying missions where his helicopter was fired on by small arms and RPGs, being in convoys that were fired upon and the effects of being a gunner knowing that he killed others. [Eval at 5]  Both his parents described the changes they observed in Hunt after serving in Iraq, the loss of his Army career and his severe accident in 2014. [Eval at 8-9]

Nevertheless, Hunt loved his Army service and losing the Army "broke my heart." [Eval at 7]  Hunt's combat service warrants consideration by the Court in assessing a downward variance.

The Sentencing Commission studied the sentencing of veterans for 2019, noting that courts are required by 3553(a)(1) to consider an offender's characteristics, including military service.  See ***Federal Offenders Who Served in the Armed Forces, October 2021, p. 2*** (https://www.ussc.gov/search/site?search=veterans&sort_by=search_api_relevance&sort_order=DESC&f%5B0%5D=topic%3A770).  Although military service was not often cited as a sentencing factor, when it was cited, it was correlated with mental health problems and service in a combat zone. ***Id. at 3***.[5]  The Commission's research found that "among the reasons often cited for considering military service at sentencing are that veteran offenders often have high incidences of alcohol abuse, substance abuse, and mental health problems related to their military service." ***Id. at 9***.  Hunt's history is consistent with all these findings and warrants consideration for a variance.

### The Need For The Sentence Imposed To Reflect The Seriousness Of The Offense, To Promote Respect For The Law, And To Provide Just Punishment For The Offense

Hunt acknowledges that he bears ultimate responsibility for his conduct and acknowledges his failed attempts at treatment in the past.  However, he has now been in custody for slightly more than two years, free of heroin, methamphetamine and alcohol, with ample time to reflect on not just the seriousness of his current situation, but the seriousness of his future situation if he does not address his substance abuse and mental health issues in a committed and meaningful manner. [See Eval. At 17] He described his lengthy pre-sentence confinement as "the hardest thing I've ever had to do," and "so humbling for me." [Eval at 17]  He viewed himself as a "patriot" and took his military responsibilities seriously [Eval at 5], and previously dealt with his addiction and criminal behavior by telling himself he was not the "typical" addict or criminal. [Eval at 17] In short, his pre-sentence incarceration appears to have influenced what for him is a profound

---

[5] Only 4.4% of offenders sentenced in 2019 had served in the military. ***Id***.

acknowledgment that he has "made a mess of his life." [Eval at 17] As such, a time served

sentence has already addressed this statutory goal of sentencing.

### The Need For The Sentence Imposed  To Afford Adequate Deterrence To Criminal Conduct

### The Need For The Sentence Imposed To Protect The Public From Further Crimes Of The Defendant

Deterrence can be addressed beyond simply the length of sentence in this case.  This memo

has already discussed how humbling jail has been for Hunt.  The pending state case weighs

heavily on Hunt also.  There he is facing about 25 years in a state prison which would likely be

reduced roughly 50% with good time.  Even if the state court judge sentenced Hunt to no more

time than this court, a violation of probation in state court would subject Hunt to whatever time

was remaining on his sentence of 25 years, unlike the limitation on this Court for violations of

supervised release.  Although this Court cannot know what the state court is going to do, that court

has repeatedly delayed sentencing until after this Court's sentencing, and will undoubtedly be

made aware of what this Court does and the reasons.  It is likely that any mitigation in the state

court sentencing will include another 5 years of probation and the possibility of imposing the full

remaining sentence upon revocation.

This memo argues above at length that Hunt's criminal history is not reflective of

dangerousness or a risk of future crimes. Hunt insists that he is an addict, not a trafficker [Eval at

17] and as discussed above the factual bases of his pleas support that.   Nor is his possession of a

firearm in this case or previously an accurate measure of dangerousness.  As discussed in the

evaluation, guns have always been a part of Hunt and his family's lives, and having a weapon is

"inbred into your core in the military." [Eval at 17]  Undersigned counsel was appointed after the

plea hearing, but prior counsel who negotiated the plea wrote that the amended language in the

plea agreement [Doc 36, p. 4-5] was to "reflect Mr. Hunt's agreement that he possessed a loaded

magazine, not a loaded firearm, which is a somewhat important distinction to a combat veteran for

whom such things matter a great deal." Finally, further evidence of the deterrent effect Hunt's pre-sentence incarceration has had, he told Dr. Johnson that "I'm going to be the first solder that's afraid of guns," to avoid legal problems and further incarceration. [Eval at 17]

### The Need For The Sentence Imposed To Provide The Defendant With Needed Educational Or Vocational Training, Medical Care, Or Other Correctional Treatment In The Most Effective Manner

Given Hunt's history, the best program for him is the VA Residential Rehabilitation and Treatment Program in Albuquerque at the Raymond G. Murphy VA Medical Center. This placement should be facilitated through the RIO program (Reentry through Integrated Opportunities), a re-entry/problem solving court established in this district, and Hunt requests that upon his release he be referred to the RIO program. Hunt has previously worked with Joile Rodriguez, LCSW, Director, Critical Incident Response Team, Veteran's Justice Programs, and Camila Lopez, LCSW, Coordinator, Veterans Justice Programs. The Veteran's Administration is uniquely qualified to provide services for disabled veterans such as Mr. Hunt. If Hunt's sentence results in commitment to the Bureau of Prisons, Hunt requests a recommendation for the BOP RDAP program.

### Sentencing recommendation

The Judiciary Sentencing Information (JSIN) contained in the PSR notes that for 135 defendants whose primary guideline was 2K2.1 (excluding 5K1.1 departures) whose final offense level was 27, criminal history V, the average length of imprisonment imposed was 108 months. [PSR, ¶116]. Those 135 defendants represent only a fraction of the 37, 290 defendants with convictions under 18 U.S.C. 922(g) for fiscal years 2018-2022. See *Quick Facts, 18 U.S.C. §922(g) Firearms Offenses* at https://www.ussc.gov/research/quick-facts/section-922g-firearms. For fiscal year 2022 alone, there were 8,688 cases involving convictions under 922(g). *Id.* The average sentence in 2022 for non ACCA defendants was 60 months. *Id.* 38.7% received a

variance, of which 89.3% received a downward variance with an average sentence reduction of 35.7%.

Although the "numbers" suggest that Hunt is among the most dangerous or criminally involved defendants sentenced under 2K2.1, as discussed above however, the underlying facts of his prior convictions, the less serious nature of his prior convictions and when the convictions occurred, do not support the "numbers," that is, do not support categorizing Hunt among the most dangerous or criminally oriented defendants.  This memo suggests, as a starting point, a total offense level of 23 and a criminal history category III, which has a guideline range of 57-71 months.  The JSIN database indicates that there were 569 defendants in that category in fiscal years 2018-2022, who received an average sentence of 56 months, roughly the average sentence for all defendants sentenced under 2K2.1 for FY 2018-2022.  When considering all the 3553(a) factors, Hunt seems far more "average" or "below average" than his calculated guideline range suggests.

Hunt's adverse childhood experiences, lack of youthful guidance, military service and resulting mental health issues, traumatic brain injuries, in combination, support a variance from the suggested offense level 23, criminal history category III. Hunt requests that the Court consider a variance to what would amount to a time served sentence of 2 years, 1 month and 6 days (765 calendar days from February 7, 2024 thru March 12, 2024).  This would not result in his immediate release as he still faces sentencing in his state court cases on March 13, 2024. Additionally, three other states still have pending warrants.[6]

---

[6] Prosecutors in Colorado and Utah have indicated to counsel that they will evaluate how they want to proceed after Hunt is sentenced in his New Mexico state and federal cases.  Hunt's prior attorney in Massachusetts indicated that he can attempt to obtain a video status hearing there as soon as Hunt is sentenced here.

After the Court determines the final guideline range, and in combination with other variances, Hunt requests that the Court vary seven hundred and sixty five (765) days to avoid what could be a significant disparity in the actual sentence Hunt serves.  Hunt has been incarcerated since February 7, 2022 (765 days as of March 12, 2024). Because he is in primary state custody, he will not receive credit for this time in this case. [PSR, Release Status]  If the state court suspends its sentence in it entirety or for any reason does not sentence Hunt to incarceration, Hunt will not receive any credit for the time spent in pre-sentence confinement.  If this Court varies in an amount equal to the pre-sentence confinement, the state court will be aware that credit has been awarded and as noted above, will have "all the information before it when it acts."

Finally, Hunt requests that this Court run its sentence concurrent to the anticipated state court sentence.  The State court has continued its sentencing a number of times in order to see what happens in this case.  Hunt is facing a possible sentence in state court of roughly 25 ½ years. This Court cannot know what the state court will do, however, the United States Supreme Court has stated that this Court has authority to run its sentence concurrent to a yet to be imposed state sentence.  ***Setser v. United States, 132 S.CT. 1463, 1468, 566 U.S. 231 (2012***).  The Supreme Court rejected the idea that a district court should not make the consecutive/concurrent decision without having all the information about the anticipated state sentence. *Id. at 1472*. Rather, the Supreme Court stated:

> it is always more respectful of the State's sovereignty for the district court to make its decision up front rather than for the Bureau of Prisons to make the decision after the state court has acted. That way, the state court has all of the information before it when it acts.

*Id. at 1471*.

Therefore, Hunt requests that this Court order its sentence to run concurrent to the sentences yet to be imposed in State of New Mexico v. Jeremy Hunt, D-1116-CR-2019-00645-8, D-1116-CR-

2019-00777-8, D-1116-CR-2019-00778-8, D-1116-CR-2021-00249-8, D-1116-CR-2021-00251-8

and D-1116-CR-2021-00272-8.

Respectfully submitted,


/s/ Douglas E. Couleur
Douglas E. Couleur
P.O. Box 6138
Santa Fe, NM 87502
(505) 984-1962
(505) 819-0522 (fax)
doug@couleurlaw.com

CERTIFICATE OF SERVICE

I hereby certify that on February 27, 2024, I filed the foregoing pleading electronically through the CM/ECF system, which caused counsel of record for the United States and the Probation Office, to be served with a copy of this pleading by electronic means.

Electronically filed /s/ Douglas E. Couleur